## State of Texas v. Trinity Life & Annuity Society.

### Decided March 30, 1910.

**1.—Benefit Insurance Company—Insolvency.**

A fraternal insurance company, depending on dues and assessments of members to meet its liability for losses, is not insolvent because the funds on hand are insufficient to meet death losses suffered and its management refuses to assess its members in a sum sufficient to raise such amount, where the losses in question are not yet due, being payable in monthly installments for one hundred or more months, all installments due have been paid, and the company is a going concern with prospects of meeting such installments as they mature.

**2.—Same.**

Where the State sought the appointment of a receiver for a fraternal assessment insurance company as an insolvent concern, its insolvency did not appear from the fact that it had no present cash assets sufficient, at interest, to discharge death losses already incurred but payable only in monthly installments. It could not be compelled to adopt such method of providing for their payment or raise by assessment, in advance of the maturity of such obligations, a present fund sufficient to meet them; and its power to raise money by assessment as the same might become necessary was to be considered in determining its solvency.

Appeal from the District Court of Travis County. Tried below before Hon. Charles A. Wilcox.

*R. V. Davidson,* Attorney-General, and *Wm. E. Hawkins* and *C. A. Leddy,* Assistants, for appellant.—A corporation is insolvent when its liabilities are greater than its assets, and it appears that it can not conduct the corporate enterprise with reasonable prospect of success. Hart v. Wynne, 40 S. W., 848; Dewey v. St. Albans Trust Co., 56 Vt., 476; Toof v. Martin, 80 U. S. (13 Wall.), 40; Citizens'

Bank and Trust Co. v. Union Mining Co., 106 Fed., 97; In re Temple of Honor, 76 N. W., 59.

Where it is shown that the liabilities of a corporation exceed its assets, the burden is upon the corporation to show that it is prosecuting its line of business in such a manner as will, in all reasonable probability, enable it to meet its obligations as they mature. Lyon-Thomas Hardware Co. v. Perry Stove Mfg. Co., 86 Texas, 143; State v. Bankers Union of the World, 71 Neb., 622; Knight v. Supreme Order Chosen Friends, 6 N. Y. Supp., 427; Evarts v. United States Mut. Assn., 16 N. Y., 27; State ex rel. Jenkins v. Equitable Indemnity Assn. of Washington, 52 Pac., 234.

Where it is shown that a fraternal beneficiary association is insolvent, a receiver should be appointed to take charge of such corporation and all of its assets and wind up all its affairs and business. Acts 30th Leg., chap. 137, p. 341; Stamm v. Northwestern Mut. Ben. Soc., 65 Mich., 317; Wilber v. Torgerson, 24 Ill. App., 119; Chicago Mut. Assn. v. Hunt, 127 Ill., 257; St. Louis & S. C. & M. Co. v. Sandoval, 116 Ill., 170; Slee v. Bloom, 19 Johns., 456.

*A. E. Firmin* and *S. M. Posey,* for appellee.—The membership and monthly assessments of a fraternal beneficiary association are assets of very great importance in determining solvency or insolvency; and where the association has a large reserve, its obligations are being met as they mature promptly and in full accordance with the terms of its certificates, and its membership and assessments are sufficient to meet its obligations in future at their maturity, it is solvent. Art. 2542a, title XLIXA, Rev. Stats. Texas; chap. 36, Genl. Laws 1909, sec. 36, page 370.

KEY, CHIEF JUSTICE.—The nature and result of this suit is stated as follows in appellant's brief: "This was a suit by the State of Texas, filed November 28, 1908, against the Trinity Life and Annuity Society, a fraternal beneficiary association, incorporated under the laws of this State, having a domicile in Dallas, Dallas County, Texas. On January 2, 1909, plaintiff filed its first amended petition in which it alleged that the defendant was at the time of filing thereof, and for a year prior thereto, hopelessly insolvent. That on the 31st day of December, 1907, the admitted assets of defendant were $437.29, and that at said time the defendant's liabilities were $8195.40, making an excess of liabilities over assets of $7758.11. That since said date there has been no change in the financial status of defendant company except that said society had accumulated in the benefit fund $2938.80, out of which it had paid $198, leaving in said fund $2740.80. That defendant association had on hand in a special fund derived from the payment of certificate holders in assessments the sum of $439.85. That defendant association also held, in addition to the above, notes given by certificate holders, amounting to $215, which will be paid to said association in the event they should not be declared insolvent in this proceeding. That since December 31, 1907, defendant has acquired an additional liability upon a death claim, amounting to $4500,

upon which it had paid two monthly installments, amounting to $90. That the present value of the unpaid portion of this death claim amounts to approximately $9000, which added to defendant's liabilities on December 31, 1907, would make a total of $17,765.40, being the liabilities of said company at the time of the filing of plaintiff's amended petition. It was further alleged that the usual monthly assessments of defendant to those who were the certificate or policyholders at the respective dates of the death of the policy- holders by reason of whose death the above mentioned loss or claims occurred, respectively, were and are respectively insufficient in the aggregate to pay off and satisfy said claims or loss, and defendant has never made upon the aforesaid members any special assessment or assessments sufficient to pay off and satisfy said death claim, but has declined and refused and still declines and refuses to do so, assigning as a reason for failing to do so that were it to do so such special assessments would be so excessive in amount as to disrupt the organization and force a suspension of business by said corpora- tion; that instead of making special assessments upon its members who were members at the time of the death of the parties whose beneficiaries have unpaid claims against it, the defendant has paid two monthly installments out of its general benefit fund and intends to continue to pay such installments upon such death losses out of said fund, although said fund will be largely made up of payments by members or certificate holders, who were not members or certifi- cate holders of defendent at the respective dates of the death of the said deceased policyholders or any of them.

"Plaintiff prayed for an order appointing a receiver to take charge of the defendant corporation, its property and assets, in order to wind up the affairs and business of said corporation, and for a restraining order enjoining defendant from doing any business what- ever pending final action of the court, and for judgment canceling charter of defendant corporation and perpetually enjoining defendant from doing business in Texas.

"Defendant answered by general demurrer, general denial and specially to the effect that defendant corporation had not failed, neglected or refused to pay any accrued or matured death benefit or installment of benefit. That said sum of $16,654.40, alleged as the liability of said company by plaintiff are not charges legally asserted, chargeable or computed, having no warrant or basis in fact, either under the contract issued by defendant or by virtue of any statute affecting or controlling beneficiary associations. That the defendant company could not legally levy a special assessment until there exists a present liability unpaid and for which demand could be made or suit maintained.

"Defendant admitted in its answer that the statement of assets and liabilities contained in plaintiff's petition were correct except as to the item 'present value of death claims unpaid installments, $7655.40,' therein contained, which is denied as an indebtedness or legal charge against it. Defendant admitted that it had lost two members whose beneficiaries were entitled to receive, under the terms of their policies the sums of $5400 and $4500, respectively, said

sums to be paid out in accordance with its constitution and by-laws and the terms of the policies in monthly installments of $54 and $45 per month, respectively, during the life of the beneficiary unless remarried, in which event said payments are subject to be made only until said beneficiary shall have received the total sum of $5400 and $4500, respectively. That it has paid the said beneficiaries the sum of $810 and $450, respectively, and that said payments can and will continue to be made without default and in strict accord with the terms of its membership certificates.

"Defendant admits that it has refused and still refuses to levy an extra assessment, as alleged by plaintiff, but denies that it has done so for the reason alleged; that its assessments of its members are sufficiently large to pay all its matured monthly benefit payments as well as to provide a further reserve benefit or mortuary fund to amply secure the payment of any contingent or possible liability to arise under the terms of its certificates. That the funds now on hand of said association are more than ample to meet all present demands upon it, and that no extra assessment can legally, or under the terms of its said certificate, be levied or assessed, only in the event the sum so set aside as beneficiary fund shall be insufficient to meet claims against it capable of an immediate assertion and collection.

"On the 28th day of May, 1909, a jury having been waived, this case was tried before the court who rendered judgment for the defendant, to which judgment the plaintiff duly excepted and gave notice of appeal and has assigned errors."

The case is presented to this court upon two assignments of error, both of which present the contention that the testimony shows that appellee is an insolvent corporation, and therefore that a receiver should have been appointed in accordance with a statute of this State authorizing suits of this kind by the State, and providing for the appointment of a receiver for an insolvent corporation. The facts relied on in support of the alleged insolvency are stated as follows in appellant's brief:

"Defendant admitted in its answer that it owed the sum of $9900 death claims, only a small portion of which had been paid, and that it had on hand funds available for the payment of its obligations in the sum of $2780.40.

"T. B. Love, Commissioner of Insurance and Banking, testified that the present value of the outstanding obligations of defendant to the beneficiaries of its deceased policyholders was about $16,000. The report of Actuary Wolfe offered in evidence by plaintiff, shows that the present value of the outstanding obligations against the defendant is $17,655.40.

"R. E. Bennefield testified for the defendant: 'As to how much we had on hand in our various funds, I will say that we had about $3000 in the beneficiary fund when Mr. Love filed his petition for a receiver. Since then we have received between $1000 and $1400 in cash and notes. The face of our two policies amounted to $9900. I do not remember the exact amount which Mr. Wolfe's report requires us to set aside as a sum that at four percent would fulfill

the obligation; it is in Mr. Wolfe's report. I know it is a great deal more than the face of the policy. In addition to this benefit fund of $3000 we had on special deposit seven or eight hundred dollars in cash and four or five hundred dollars in notes. We had in cash $700 or $800 deposited in the State Bank. That represents the premiums paid in since the 12th of November, the day the Attorney-General filed his suit. . . . All of the $3000 mentioned above was paid in before the suit for this receiver was filed. Our liabilities of that character, that is, this fixed liability, although the payments may be made in monthly installments according to contract, does not largely exceed all our assets of every amount, for the simple fact that the asset of our membership is worth ten times what that amount is to the society. As to convertible cash assets, that is an entirely different thing, and outside of the asset consisting of the membership and the fact that we are a going concern, that is, if we had a certificate, this liability largely exceeds the cash assets. I admit that and have always admitted it. It is a fact that if you were to take a sum of money placed at four or five percent that would bring in revenue sufficient to pay the monthly installments on the losses that have already occurred that that assumed sum of money would be larger than our assets today. I admit that.'

"Thomas B. Love, Commissioner of Insurance and Banking, testified: 'I became convinced from the investigation I was making that the society was being very extravagantly conducted and that it was probably in a bad financial condition. Mr. Gano, of Dallas, and Mr. Bennefield, who was at that time the agency director of the company, came to my office a number of times and I saw them in Dallas, one or both of them on several occasions. I remember having a conversation or conference with them one day in the department, at which I told them I thought it was absolutely impossible for them to carry out the contract under the scheme they were working under. Mr. Bennefield took strong issue with me. Finally I said that Mr. Wolfe, of New York, was going to be down here in a few weeks to examine a Texas company, and I would leave the whole thing until he came, if they desired, and would let him make an examination and report to me, and they agreed to do that. When Mr. Wolfe came down and made an examination of the company, he reported that the company was selling all of its insurance on what is known as the installment plan—the benefits were payable in installments. Practically all the policies provided that when a member dies the beneficiary would receive $50 per month for 100 months, or $50 a month for each month of the rest of her natural life. In order to explain the point at issue between us and show the theory upon which I acted, I will say that fraternal beneficiary associations are assessment concerns. They have no assets and are required to have none. Their sole reliance for paying any benefits is by assessments levied upon the members. They may levy an assessment at the time of every death, or they may charge what are called level periodical premiums, but when they charge those level periodical premiums they are required to levy a certificate and state in that certificate that the premiums are not sufficient to pay the death loss. Now, the

difference between this beneficiary association and most of them is that when a member dies instead of paying $5000 at the date of death, and if the money was not on hand by levying the assessment, it provides that it might be payable $50 per month for 100 months. Mr. Wolfe reported that the company had on hand practically nothing on December 31, 1908; that at that time it had outstanding obligations to pay $50 per month for 100 months on death claims, the present value of which was about $7000, I believe. By the term "present value" is meant that the amount invested at interest would produce $50 per month for 100 months. I did not charge the company with the full amount of this claim, but with an amount which invested at interest would yield that as often as they became due. Some time in February, I think, possibly as late as March, it was reported that since the beginnning of 1908 another death claim had accrued, and that the present value of installments due on that death claim would amount to $9000. I do not remember what the actual amount of its death claims were. I think the one that occurred this month was $45 per month. Mr. Bennefield and Mr. Gano came down when that report was made and I took it up with them and I told them I thought their company was, in view of that condition, hopelessly insolvent; that they ought not to be allowed to collect premiums from new members with that great liability outstanding; that if the members knew that the company owed that much more than it had, that they would not pay out their money to become members of it; and that they ought not to be allowed to continue to take premiums when they could not do it except by concealing that fact from them. They said they were not insolvent because they had the power of assessment. I told them that in my view they certainly did not have the moral right, and I did not think they had the legal right to run any assessment, except upon members who were members at the time the death occurred. I did not think they could wait fifty or sixty months and run out of money and then run an assessment on members to pay installments then due which arose out of the death of members who died long before the time these members of the association became members; that I thought it was the duty of the association at the time the death occurred to run an assessment to pay the claim and make up any deficiency to pay the claim if it was a claim payable at once, as most of them were; or if it was a claim payable in installments, as others were, that it was their duty to create a fund out of which to pay installments as they became due. The thing I urged them to do last January was to run an assessment of a sum sufficient to create an amount equal to their liability on those deferred death claims on the members belonging to the society at the time the death claims occurred; they said if they did that the members would all quit, would not stand the assessment and it would end the society.'

"R. F. Bennefield testified: 'Mr. Love was trying to force the Trinity Life to issue extra assessments in sufficient amounts to equal an amount that Mr. Wolfe claimed would amount, at four percent interest at the end of 100 months, to this death loss. I quoted to Mr. Love the provision in our constitution and by-laws which is our

supreme body, our supreme power and guidance, in regard to levying extra assessments, and this is the exact language, as I remember it: "There shall never be an extra assessment unless there is an insufficient amount of money in the beneficiary fund to meet the claims of beneficiaries of the fraternity." In speaking of the advice of the commissioner that we levy additional assessments, I did not say that I objected to it because it was not provided by the constitution and by-laws, but because it was in violation of our contracts. There is only one policy issued with the exception of life annuity. All of our beneficiary certificates are issued for 100 months, while the supplementary contract continues the contract beyond the 100 months if the widow lives and does not remarry. In all, our company had three death losses—one at Sherman, one at Dallas and one fraudulent case at Amarillo. As to the others, the first one was Dr. Anthony, of Sherman, and the other was Mr. Dunn, of Dallas, in January. The amount of the certificate in the Anthony case was $5400, and the provisions of payment were $54 per month for 100 months guaranteed. In the Dunn case it was $45 per month for 100 months, guaranteed. In both these policies there was a provision for an additional payment; the provision was by paying a certain amount every year, we would continue the contract as long as the beneficiary lived and remained a widow. In both cases the policies were made payable to the widows of the deceased, so that the company is liable to pay this monthly amount of $54 and $45 for 100 months guaranteed, and then until death or remarriage. I do not know when either one will remarry. I know how old they are. Mrs. Anthony is 61 and the other is 31 and in very poor health. According to the American mortality table a person 60 years of age has about eleven years to live, and one 31 years of age has about thirty-four years to live, according to my recollection. Where the beneficiary is wife, father or mother, the wife being not more than five years older, an additional assessment per year will continue the contract for life."

In addition to that statement, we deem it proper to add that appellee's constitution and by-laws and the contracts with its members not only require the regular payment by each member of regular dues, but authorize the governing body to levy extra assessments "whenever there shall be an insufficient amount of money in the benefit fund to meet the claims of the beneficiaries of the fraternity." The corporation commenced business January 4, 1907, and its annual report filed December 31, 1907, showed a membership at that time of 279. The undisputed testimony shows that it had paid all of its obligations as soon as they matured, had not suspended business, but was a going concern and had available assets, amounting to about $3500.

The contention urged on behalf of the State to the effect that appellee should be declared insolvent, because its liabilities are greatly in excess of its assets, is not regarded as tenable. While such excess of liability is shown, it is also made to appear that the greater portion of it is unmatured indebtedness, and that not more than $90 thereof will become due during any one month. In the luminous opinion of Chief Justice Stayton, in Lyon-Thomas Hard-

ware Co. v. Perry Stove Manuf. Co., 86 Texas, 165, that learned jurist quotes with approval the following excerpt from a case therein referred to: "At what stage of a corporation's affairs must it be pronounced insolvent, so as to bring it within the principles we have declared? It is not enough that, its assets are insufficient to meet all its liabilities, if it be still prosecuting its line of business, with the prospect and expectation of continuing to do so; in other words, if it be, in good faith, a 'going' business or establishment. Many successful corporate enterprises, it is believed, have passed through crises, when their property and effects, if brought to present sale, would not have discharged all their liabilities in full. We feel safe in declaring that when a corporation's assets are insufficient for the payment of its debts, and it has ceased to do business, or has taken or is in the act of taking a step which will practically incapacitate it for conducting the corporate enterprise with reasonable prospect of success, or its embarrassments are such that early suspension and failure must ensue, then such corporation must be pronounced insolvent."

Applying that rule to this case, and keeping in mind the fact that the burden of proof rested upon the State to establish insolvency of the corporation, and not upon the corporation to disprove insolvency, we are of opinion that the trial court did not err in deciding against the State upon that issue. The undisputed testimony not only shows that the corporation had about $3,000 in cash in its benefit fund, but it had the power to levy extra assessments upon all of its members for the purpose of maintaining that fund. It may be conceded that if the corporation had pursued the course suggested and insisted upon by the Commissioner of Insurance, it would have rested upon a sounder basis if its business had continued, but it is not made to appear that it was necessary to pursue that course in order to maintain solvency. We think the testimony warranted the trial court in reaching the conclusion that, notwithstanding the excess of liabilities over assets, the corporation was still prosecuting its line of business, with the prospect and expectation of continuing to do so; or, in other words, was, in good faith, maintaining a going business or establishment. And, such being the case, upon the authority cited and quoted from, we hold that the corporation was not insolvent.

Before concluding this opinion, it is deemed proper to refer to an Act of the Thirty-First Legislature regulating fraternal beneficiary associations, one section of which reads as follows:

"Sec. 36. Any association doing business under the provisions of this Act may issue term payment certificates upon the death of members within the term for which said payments are limited, or limited payment, full life certificates payable at death, provided that the contract with the member shall provide that if such limited or term payments are not sufficient to meet the liabilities of the association for death benefits as same accrue, additional assessments may be made for this purpose."

While that statute did not become a law until after this case was tried, it will be observed that, like appellee's contracts with its

members, it expressly authorizes the levy of assessments for the purpose of maintaining a sufficient benefit fund, thereby giving legislative sanction to the proposition that, in cases of this kind, the power to levy additional assessments is an important factor in determining the question of the corporation's solvency.

No error has been shown and the judgment is affirmed.

*Affirmed.*

Writ of error refused.